IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Michael Birkemose-Hansen, | : | |
| | : | Case No. 1:09-cv-203 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING DEFENDANTS' |
| Zwanenberg Food Group (USA), Inc., *et al.*, | | MOTION FOR SUMMARY |
| | : | JUDGMENT |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 8). Plaintiff Michael Birkemose-Hansen has sued Defendant Zwanenberg Food Group (USA), Inc. ("Zwanenberg" or "Zwanenberg USA") and two of its managers, Frank Schmitt and James Anthony, for the alleged failure to pay him the full amount of overtime wages to which he was entitled pursuant to federal and state law.  Defendants move for judgment on the basis that Hansen is an exempt professional employee not entitled to additional overtime wages.  For the reasons that follow, the Court will **GRANT** Defendants' Motion.

I.      BACKGROUND

A.      **Introduction to the Parties**

Zwanenberg is an Ohio corporation engaged in the business of manufacturing and packaging canned meat products for sale to consumers.  Zwanenberg is a subsidiary of a Dutch company known as Zwanenberg Food Group, B.V. ("Zwanenberg BV").  Zwanenberg began its operations in Cincinnati in 2006.

When canning meat products, the lid must be hermetically sealed to the body of the can

1

to seal out air and protect the meat from spoiling. The process of sealing the lid to the body of the can is known as "seaming." Cans in which meat products are placed can be round or "shaped." Shaped cans, also known as "speciality cans," are more difficult to seam because of the multiple corners and bends in the cans. The majority of cans which Zwanenberg BV tasked Zwanenberg USA to seam were speciality cans. However, when Zwanenberg opened its Cincinnati facility, none of its employees had the ability to seam speciality cans.

Plaintiff Hansen is, and was at all time relevant hereto, an employee of Glud & Marstrand A/S ("Glud"), a company located in Denmark. (Hansen Dep. 11-13.) Glud has a long-standing business relationship with Zwanenberg BV. When Zwanenberg USA opened its Cincinnati facility, Glud supplied Zwanenberg with some of the equipment necessary to properly seal certain types of specialty cans. Glud also supplied (and continues to supply) Zwanenberg with specialty cans for meat products.

Zwanenberg USA requested Glud to provide it with Hansen's services because Hansen had the ability to set up, operate, maintain, and repair the machinery necessary to seam speciality cans. Previously, Hansen had seamed specialty cans for Zwanenberg BV in Europe. Hansen also had the ability to train Zwanenberg USA's employees to seam speciality cans. Glud agreed to post Hansen with Zwanenberg in Cincinnati.

Hansen had achieved in Denmark the educational equivalent of a bachelor of science degree in engineering technology. (*Id.* at 42.) Hansen stated in his Curriculum Vitae that he had "achieved world-class knowledge of very specialized techniques in packaging." (*Id.* Ex. 3.) A financial manager for Glud stated in a letter to the U.S. Consular Office in 2006 in regards to Hansen's H-1B visa application that Hansen would assist Zwanenberg "in establishing protocols

2

for efficient, safe and productive operation of this highly sophisticated and specialized machinery at the U.S. company, and train its employees with respect to the above." (*Id.* Ex. 7.) Hansen testified that he agreed with the statements made in the Glud letter to the U.S. Consular Office that the work he did for Zwanenberg was "more special than a normal operator." (*Id.* at 45-47.)

**B.     Hansen's Employment at Zwanenberg**

    **1.     Contracts and Wages**

In June 2006, Zwanenberg and Glud entered into a contract entitled "Contract–Technical Assistance" ("the 2006 Contract") regarding Hansen's services for Zwanenberg.[1] (Hansen Dep. Ex. 2.) Pursuant to the 2006 Contract, Hansen remained a Glud employee throughout his posting at Zwanenberg. The 2006 Contract called for Hansen to be posted with Zwanenberg for a two-year term starting June 15, 2006, with an option for an additional year. Hansen's wages, both regular and overtime, were to be paid through Glud. In this regard, the Contract provided that Hansen's monthly salary of $7,258 would be split equally between Glud and Zwanenberg and that Glud would invoice Zwanenberg for Zwanenberg's portion of his salary. The Contract also called for Zwanenberg to pay Hansen $1000 per month to defray Hansen's living costs.

As to Hansen's overtime wages, the 2006 Contract provided that Glud would invoice Zwanenberg at the rate of 497 Danish Kroner for every hour of overtime which Hansen worked. Hansen testified that 497 Kroner is the equivalent of approximately $100 U.S. currency. Hansen received this hourly rate for his overtime work from June 2006 until he was issued his H-1B visa

---

[1] The 2006 Contract contains a provision calling for disputes to be resolved by arbitration in Copenhagen pursuant to Danish law.

in the fall of 2007.

      To obtain his H-1B visa, Hansen had to receive his compensation directly from Zwanenberg. In November 2007, Zwanenberg and Glud, therefore, entered into an "Addendum to Contract regarding Technical Assistance" ("2007 Addendum") with new terms of payment for Hansen which were effective beginning October 1, 2007. (Hansen Dep. Ex. 12.) Pursuant to the 2007 Addendum, Zwanenberg paid Hansen a weekly salary of $1,024 per week plus overtime. The 2007 Addendum did not specify an overtime rate for Hansen.

      Frank Schmitt, the General Manager for Zwanenberg USA, stated in his Declaration that he and Hansen agreed that Zwanenberg would pay Hansen $35 per hour for overtime wages, a reduction from Hansen's previous overtime rate. (Schmitt Dec. ¶ 12.) Hansen denied that he agreed to accept $35 per hour for overtime wages pursuant to an agreement with Zwanenberg. (Hansen Dep. 67, 73-94.) Nonetheless, Zwanenberg paid Hansen $35 per hour for overtime from the time he obtained his H-1B visa in October 2007.[2]

      In November 2008, Zwanenberg and Glud entered into a third contract pertaining to Hansen, also entitled "Contract – Technical Assistance" ("the 2008 Contract"). (*Id.* Ex. 13.) The 2008 Contract basically continued the terms of the 2007 Addendum Agreement. Again, the 2008 Contract called for Zwanenberg to pay Hansen overtime wages directly, but did not specify an amount. Hansen continued to work overtime and to accept payment for the overtime at a rate of $35 per hour until his posting at Zwanenberg ended in 2009. However, Hansen contends that he was entitled to the $100 per hour rate for overtime wages which he had received pursuant to

---

[2] Hansen testified that Zwanenberg paid him $35 per hour for overtime starting in January 2007, months before Hansen obtained his H-1B visa in October 2007. (Hansen Dep. 81, 88, 93.)

the 2006 Contract. Hansen did not complain in writing to anyone at Glud or Zwanenberg about the amount of his overtime payments until the summer of 2008 after he had been disciplined by Zwanenberg for misconduct. Schmitt responded to Hansen's written complaints by informing Hansen that he did not need to work overtime if he objected to his pay rate. Hansen did not believe he could do his job without working overtime. (*Id.* at 125-26.)

### 2. Job Responsibilities

The 2006 Contract and the 2008 Contract stated as follows as to Hansen's working conditions at Zwanenberg:

> [Hansen's] working conditions . . . will be as seaming room supervisor. He will be charged with sufficiently efficient operating conditions in room 27. He will be primarily charged with training and developing operators. He will be responsible for establishing and implementing a preventative maintenance programme in cooperation with Zwanenberg FG's Maintenance Manager, but [Hansen] will retain the primary responsibility of this work. He will be responsible for establishing a programme for safekeeping and efficient use of spare parts for all equipment in that room.

(*Id.* Exs. 2, 13.).

Despite the written job description in the Contracts, Hansen denied that he was seaming room supervisor or that he was solely responsible for operations in the seaming room. (*Id.* at 23-25.) Hansen stated that his job at Zwanenberg required him to utilize his engineering skills. (*Id.* at 49.) He described his job duties generally as "to get so much flow [from the seaming equipment], to run as many cans as possible and have good stable production[,] and repair if something broke[,] and make changes when they want me to change over to another type of cans, stuff like that." (*Id.* at 17.) He also testified that one of his primary duties was to train and develop other employees to operate the seaming room equipment. (*Id.* at 26, 36.) It took three or four months to train an operator to seam specialty cans. (*Id.* at 37.) Hansen stated that during

5

his tenure at Zwanenberg only one other person had his skill level at seaming speciality cans. (*Id.*)

Hansen took credit for improving the working condition of the equipment in the seaming room and for increasing production speeds at Zwanenberg USA. (*Id.* at 25-26.) Hansen stated that he helped Zwanenberg improve from manufacturing 22-23 tons of meat products per week to over 200 tons of meat products per week. (*Id.* at 196-97 & Ex. 32.)

**C.     Procedural History**

On March 19, 2009, Hansen sued Zwanenberg USA and two company managers, Frank Schmitt, and James Anthony, for breach of contract, violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and violation of the Ohio Revised Code ("O.R.C.") § 4111.01, *et seq.* Hansen claims that he was entitled by law to overtime wages at a rate at least 1.5 times the rate of his regular wage for the hours he worked in excess of forty hours per week. Hansen calculates that the overtime wage to which he was entitled to equal $61.47 per hour, rather than the $35 per hour which he was paid. Defendants filed an Answer denying liability on May 13, 2009.

Following discovery, Defendants filed a Motion for Summary Judgment on March 12, 2010. Plaintiff opposed Defendants' Motion in part, but he has conceded his claims against Schmitt and Anthony and has conceded his breach of contract claim against Zwanenberg. (Doc. 12 at 1.) This Order addresses Hansen's remaining claims against Zwanenberg for unpaid overtime wages pursuant to the FLSA and Ohio law.

**II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary

judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

**III. ANALYSIS**

**A. The FLSA and Ohio Law on Overtime Wages**

The FLSA generally requires that "[n]o employer shall employ any of his employees . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of [forty hours] at a rate not less than one and one-half times the regular

7

rate at which he is employed." 29 U.S.C. § 207(a)(2). The FLSA provides an exemption, however, that employers are not required to pay the statutory overtime wage to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Ohio law, likewise, requires employers to "pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek." O.R.C. § 4111.03(A). Ohio law explicitly adopts the exemptions set forth in the FLSA, 29 U.S.C. § 213. *Id.* The Court will analyze the FLSA and Ohio law claims together under the federal standards. *See Horn v. Digital Cable & Comm'n, Inc.*, No. 1:06 cv 325, 2008 WL 7140826, at *3 n.1 (N.D. Ohio Nov. 18, 2008); *Trocheck v. Pellin Emer. Med. Serv., Inc.*, 61 F. Supp. 2d 685, 699-700 (N.D. Ohio 1999).

In this case, Hansen alleges that he was entitled to an overtime wage in the amount of $61.47 per hour or greater pursuant to the FLSA § 207(a)(2), but Zwanenberg argues that Hansen was an exempt professional employee not entitled to the statutory overtime wage pursuant to FLSA § 213(a)(1). Specifically, the parties dispute whether Hansen was an exempt professional employee.

**B.     Exempt Professional Employee**

Congress delegated the duty of defining the terms "executive, administrative, or professional" to the Secretary of Labor. *See Auer v. Robbins*, 519 U.S. 452, 456 (1997). The Code of Federal Regulations contains a two-part test for an employee to qualify as being employed in a bona fide professional capacity. The employee must be:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week; and

    (2) whose primary duty is the performance of work;

        (i) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . . .

29 C.F.R. § 541.300(a). The salary component of this test is not at issue here because Zwanenberg paid Hansen $1,024 per week.

As to the second part of the professional employee exemption test, the federal regulations provide three elements for meeting the primary duty requirement:

> (a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:
>
>     (1) The employee must perform work requiring advanced knowledge;
>
>     (2) The advanced knowledge must be in a field of science or learning; and
>
>     (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.
>
> (b) the phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work . . . .
>
> (c) the phrase "field of science or learning" includes the traditional professions of . . . engineering . . . and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning.
>
> (d) the phrase "customarily acquired by a prolonged course of specialized instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree . . . However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge

9

> acquired through an apprenticeship, or with training in the performance of routine mental, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

29 C.F.R. § 541.301.

The Sixth Circuit has instructed that the "exemptions to the FLSA's overtime provisions are to be narrowly construed against the employers seeking to assert them, and the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) (internal quotations and citations omitted). The issue of how an employees spends his time is a question of fact, but the issue of whether those activities qualified him as an exempt employee under the FLSA is a matter of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Nielsen v. Devry, Inc.*, 302 F. Supp. 2d 747, 752 (W.D. Mich. 2003); *Johnson v. Target Corp.*, No. 3:05-CV-153, 2006 WL 572014, at *5 (E.D. Tenn. 2006).

Applying the primary duty requirement of the professional employee exemption to Hansen, the second element of the primary duty requirement is not in dispute. Hansen's advanced knowledge in engineering is in a "field of science or learning." 29 C.F.R. § 541.301(a)(2) & (c). Hansen possesses the equivalent of an engineering degree. He testified that he had to use his engineering skills in his job at Zwanenberg. The Court finds that the second element is satisfied. Analysis of the third element of the primary duty requirement also is straightforward. The third element of the primary duty test for the professional employee exemption is that the employee's "advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(3). The fact that Hansen has the equivalent of an engineer technician degree is prima facie evidence that the

10

third element is satisfied. *See* 29 C.F.R. § 541.301(d) ("The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree."). Hansen presents no evidence to refute the prima facie finding. Thus, Zwanenberg has satisfied the third element of the primary duty test as well.

However, the first element of the primary duty requirement remains disputed. Zwanenberg must establish that Hansen's work required advanced knowledge. Work requiring advanced knowledge means "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). The test for determining whether an employee's duties fit the professional exemption is "intensely fact bound and case specific." *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996). Further, the key inquiry "focus[es] on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." *Shaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004). Stated otherwise, an overqualified employee will not be exempt based solely on his academic and employment history.

There are multiple indications in the record that Hansen's work at Zwanenberg required advanced knowledge. First, Hansen testified that he used his engineering skills in his position at Zwanenberg. Second, Hansen agreed with the statements that Glud made to the U.S. Consular Office that his position at Zwanenberg required him to "establish protocols for efficient, safe and productive operation of this highly sophisticated and specialized machinery, and train [Zwanenberg's] employees with respect to the above." (Hansen Dep. 45-47 & Ex. 7.) The parties agree that seaming specialty cans is more difficult than seaming round cans. No

Zwanenberg employee had the ability to seam speciality cans when its facility opened. Hansen testified that it took him three or four months to train other employees to operate the seaming machinery. Finally, Hansen testified that his work at Zwanenberg led to an almost tenfold increase in weekly production. The development of new techniques or procedures is one indication that a job qualifies as a professional employee position. *See Leslie v. Ingalls Shipbuilding, Inc.*, 899 F. Supp. 1578, 1582 (S.D. Miss. 1995).

Hansen provides no evidence refuting these facts.[3] His first rebuttal argument that these facts are "insufficient" because they are "only generalized and conclusory statements" is not well-taken. (Doc. 12 at 8.) Hansen also suggests that other employees performed his job duties when he was not at work. However, the deposition testimony he cites in support of that argument is vague as to the duties other employees performed and, when taken in context, supports Zwanenberg's position that Hansen's job required advanced knowledge:

> Q. All right. With respect to shaped cans was there anyone at Zwanenberg that had your skill level?
>
> A. Only that guy from Holland.
>
> Q. Who is that?
>
> A. Named Garrett.
>
> Q. Okay. And he resigned while you were still there; right, sir?
>
> A. He quit, yeah.

---

[3] The Court notes that Hansen states in his brief that "[i]t is believed that Hansen's replacement [at Zwanenberg] is not an engineer." (Doc. 12 at 3.) Hansen further stated that he was "endeavoring to obtain confirmation [of this belief] by affidavit." (*Id.* at 3 fn. 2.) In fact, Hansen has not submitted an affidavit or other evidence to corroborate this belief. The Court will not consider this unsupported assertion.

> Q. Okay. So after he resigned was there anybody at Zwanenberg that had your level of skill with respect to the shaped cans?
>
> A. They have some of the maintenance guys that were working on the stuff sometimes when I am not there, yeah.
>
> Q. And you're telling me that they had the same level of expertise that you did?
>
> A. No, they did not.
>
> Q. Okay. That's what we are talking about, sir.
>
> A. Okay.
>
> Q. Was there anyone else at Zwanenberg that had your level of expertise after this guy from Holland quit?
>
> A. No.

(Hansen Dep. at 37-38.) The Court concludes based on the totality of the evidence that Zwanenberg has established that Hansen's primary duty at Zwanenberg required advanced knowledge.

In sum, Zwanenberg has established that Hansen is an exempt professional employee for purposes of the FLSA and Ohio law. Hansen has failed to establish his claim for additional overtime wages as a matter of law.[4]

---

[4] Given this holding, the Court need not address Defendant's alternative argument that it satisfied its overtime obligations to Hansen pursuant to the "fluctuating workweek method."

## IV.	CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 8) is

**GRANTED**.

IT IS SO ORDERED.


              ___s/Susan J. Dlott_____
              Chief Judge Susan J. Dlott
              United States District Court